# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-WC-01282-COA

**LENEICE DIVINITY**                                                     **APPELLANT**

**v.**

**HINDS COUNTY SCHOOL DISTRICT AND**                  **APPELLEES**
**BRIDGEFIELD CASUALTY INSURANCE**
**COMPANY**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2022 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | LENEICE DIVINITY (PRO SE) |
| ATTORNEYS FOR APPELLEES: | ROGER C. RIDDICK |
| | MACKENZIE NICOLE ELLIS |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 01/23/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Leneice Divinity was injured while performing her duties as a special education teacher on April 3, 2014. The initial injury report stated that the injury was to her knee, but over the course of her treatment, she began to complain of additional pain in her back and upper extremities. On June 23, 2021, an administrative judge entered an order on the case which essentially stated that Divinity was to be compensated for some of her medical issues related to the work-related injury but not for all of the injuries she claimed. The Mississippi Workers' Compensation Commission affirmed that order on December 13, 2022. Divinity now appeals.

**FACTUAL BACKGROUND**

¶2.     Divinity was employed as a special education teacher with the Hinds County School District.   On April 3, 2014, Divinity was assigned to monitor students in the school gymnasium.   While doing so, she attempted to stop a fight that broke out between two students.   The students fell down directly in front of her, and one began punching the other in the face.   Divinity "grabbed [the student's] fist but [was] standing over her and [the student] kept yanking."   The student "yanked at [Divinity's] right hand" and caused Divinity to "twist in an uncomfortable fashion."   About an hour later "this burning started" in her leg "outside [her] knee."   Divinity reported the injury to her employer that day and filled out a choice of physician form.   This form only referenced an injury to her knee.   She returned to work for light duty but submitted an official notice of resignation in February 2015, citing retirement as her reason.   She retired in May 2015.

¶3.     Divinity's medical history involves multiple doctors, referrals, and procedures over a number of years.   We attempt to summarize this complicated medical history by year.

**I.     2014**

¶4.     Divinity's initial injury took place on April 3, 2014.   The following day, the burning she felt was accompanied by numbing and had spread down to her right foot and thigh. Divinity went to the MEA Medical Clinic (associated with St. Dominic's) that day and reported a knee injury.   The MEA performed an MRI on the knee.   The MEA referred Divinity to Dr. O'Mara for the knee injury and she was able to see him on April 29, 2014.

2

Her initial paperwork with Dr. O'Mara referenced only her right knee. She was diagnosed with "some patellar bursitis and patella femoral issues." On May 27, 2014, she returned to Dr. O'Mara. Dr. O'Mara indicated that after his physical exam, her knees appeared to be better, and her knee brace was proving to be beneficial. He continued her anti-inflammatory medication and recommended she begin physical therapy.

¶5. Divinity was treated by a physical therapist at The Therapy Center beginning on June 4, 2014. She "underwent therapeutic exercises" and a manual electrical stimulation to the knee; she was last seen on June 16, 2014, and was noted to be making "good progress" towards relieving her pain.

¶6. The MEA also referred Divinity to a neurologist, Dr. Wolfe, because the pain she was experiencing appeared to be associated with her nervous system. He saw her for the first time on June 3, 2014. Dr. Wolfe prescribed medication, Neurontin, but also referred her to a surgeon, Dr. Tullis. She returned to Dr. Wolfe on August 7, 2014, noting improvement in her right lower extremity pain but also noted numbness and tingling in her right arm. Divinity underwent an MRI and Dr. Wolfe determined she had a disc bulge at the L4 level. He continued her medication and ordered physical therapy. On October 16, 2014, Dr. Wolfe saw Divinity again. She indicated that her previous pain complaints remained and that her right hand and arm were numb. Dr. Wolfe continued her treatment.

## II. 2015

¶7. Divinity's first appointment with Dr. Tullis took place on January 27, 2015, and he

3

determined she had a herniated disc and needed surgery. Before Dr. Tullis performed the surgery, Divinity submitted a notice of her resignation on February 10, 2015, citing the reason as "retirement" on the form. The back surgery—a lumbar laminectomy and decompression—was performed on February 12, 2015. Dr. Tullis kept Divinity from returning to work through March 30, 2015; after that date, he recommended she go back to work on light duty.

¶8. Divinity returned to Dr. Wolfe on March 9, 2015. She indicated that because she had reduced her activity, her right arm was no longer bothering her. She returned to Dr. Wolfe on May 11, 2015, and complained of right arm numbness and lower back pain. Dr. Wolfe continued her pain medication, Lyrica, and referred her to a pain management specialist.

¶9. Divinity thus began to see Dr. Williams, who specialized in pain management. Her first appointment with him took place on May 18, 2015. She complained of low back pain and right lower extremity pain. Dr. Williams diagnosed her with "chronic post[-]operative pain, chronic low back pain, chronic lumbar radiculopathy, degenerative disc disease[,] and lumbosacral syndrome." She continued with a medication for nerve pain, Neurontin, and was prescribed Tramadol for other areas of pain. She saw Dr. Williams again in June 2015, where he continued her medications and ordered a lumbar MRI. That MRI indicated that Divinity had chronic degenerative disc disease with a previous surgery with a right L4-L5, L5-S1 repair. The MRI revealed no spinal stenosis or herniated disc.

¶10. In July 2015, Dr. Williams again continued Divinity's medications and started her on

another medication, Ultram. She continued to follow up with Dr. Williams. Divinity returned to Dr. Wolfe on September 10, 2015, and was determined to be "essentially unchanged." He thus indicated that it was unlikely that she would be able to return to teaching special education.

¶11. On October 20, 2015, Divinity underwent a Functional Capacity Exam with ErgoScience. The report from this examination indicated that Divinity was "self-limiting" and justified doing so because of her reported pain levels. The report also showed "noted inconsistencies" with Divinity's effort and performances in different areas of physical exertion. Divinity also returned to Dr. O'Mara in October and November 2015. She had not improved with her right knee pain complaints and exhibited "some lateral line joint line tenderness" in her knee. He ordered a repeat MRI for Divinity.

### III. 2016

¶12. Dr. Tullis recommended a repeat MRI for Divinity and that occurred on January 11, 2016. The MRI indicated degenerative disc disease in her lumbar region but did not indicate any other changes. She returned in February complaining of pain, and Dr. Tullis recommended physical therapy. Also, in February 2016, she returned to Dr. O'Mara complaining of right knee pain. Dr. O'Mara referred her to a physical medicine doctor for further recommendation. Divinity continued to follow up with Dr. O'Mara throughout 2016 with no noted improvement.

¶13. On May 27, 2016, Divinity saw Dr. Vohra for an Employer's Medical Evaluation. He

noted that he did not believe the numbness she was experiencing in her right upper extremities was due to the work injury. Dr. Vohra indicated that Divinity was of "normal strength" and exhibited signs of chronic pain. He suggested that she improve her level of physical activity in order to improve her "physical situation." He observed that Divinity was resistant to the idea of increasing her physical activity. She saw Dr. Vohra again on July 20, 2016, where he reviewed her EMG/Nerve Conduction Study results he had ordered at their last appointment. He informed her that the injured nerve had healed and that he could not offer her any help beyond that. He referred her to a cognitive behavioral program.

¶14. On June 2, 2016, Divinity reported moderate pain relief to Dr. Williams and was continued on her prescribed medication and instructed to now follow up with him every few months. In October 2016, she returned to Dr. Tullis, complaining of worsened pain in her back, numbness in her right arm, hand, and leg, and spasms in the groin. Divinity indicated "that she was in favor of surgery" but Dr. Tullis did not believe it would be beneficial. He placed Divinity at maximum medical improvement and determined that it was not possible to make a recommendation on whether she could go back to work. Because Divinity claimed that she could not return to work, Dr. Tullis agreed "by default."

¶15. On November 17, 2016, Divinity saw Dr. Williams again. He continued her medications and added a new prescription, Movantik. At this appointment, Divinity was noted to have improved with her pain management since prior visits and was taking part in a physical therapy program.

¶16.  Divinity was referred to Dr. Koestler for a psychological pain evaluation on August 10, 2016.  She was overall diagnosed with depression and an adjustment disorder and began following up with Dr. Koestler over the next couple of months.  Dr. Koestler noted that Divinity "was argumentative at times as she was encouraged to discuss her diagnoses with her physicians."  After three follow-ups, Divinity "continue[d] to be extremely somatically preoccupied" and "focused on what seemed to be an effort to convince [Dr. Koestler] that she [was] disabled."  Dr. Koestler also noted that Divinity felt "that her condition [wa]s a result of delays in [the Commission] authorizing medical services."  Divinity stopped seeing Dr. Koestler following that appointment.

## IV.    2017

¶17.  On February 7, 2017, Divinity was given an injection by Dr. Williams.  She followed up in March and noted improvement in her pain.  However, on May 4, 2017, Divinity returned to Dr. Williams and reported elevated pain, chronic pain, low back pain, and pain in her buttocks and right leg.  Dr. Williams ordered an MRI that took place on July 10, 2017.  While the MRI showed degenerative disc disease, it showed no spinal stenosis or herniated disc.  Dr. Williams continued Divinity on her medications and stated that he would consider her for a spinal cord stimulator trial.

¶18.  Additionally, on April 5, 2017, an orthoscopic procedure was performed on Divinity's right knee per Dr. O'Mara.  In her own words, addressing her knee injury "had to wait because of the [pain in her] back."  She returned to Dr. O'Mara on April 18, 2017, where it

7

was noted that her right knee was improving. She was instructed to continue with her physical therapy.

¶19. On May 11, 2017, Divinity saw Dr. O'Mara complaining of pain in her right knee. She received an injection in her knee and continued with anti-inflammatory medication and physical therapy. She returned to Dr. O'Mara in July 2017 and indicated that her knee pain had lessened. While she did complain of "symptoms" in her right leg, Dr. O'Mara determined it was "sciatica related" and recommended she continue home exercise. He placed her at maximum medical improvement, assigning her a 5% anatomical impairment rating to her lower right extremity. He did not, however, assign her "any permanent physical reactions based upon [her] knee injury and resulting surgery."

## V. 2018

¶20. Divinity saw Dr. O'Mara for the last time on January 15, 2018. Her physical exam revealed "just deep[-]seated pain in the knee" which was diagnosed and treated as inflammation. In the meantime, Divinity had continued treatment with Dr. Williams for pain management. In March 2018, she noted no improvement in her pain; Dr. Williams referred her for psychological counseling. Divinity saw Dr. Datz that April and reported thoughts of suicide, having no interest in being around people or performing activities she had done in the past. After performing several evaluation tests on Divinity, Dr. Datz determined that she was not a good candidate for a spine stimulator implant. Divinity continued treatment with Dr. Datz and reported slight improvement in July 2018. On August 6, 2018, Divinity saw

8

Dr. Williams with complaints that her pain was worsening in her lower extremities. She returned in October 2018, where Dr. Williams prescribed her Cymbalta and Baclofen.

## VI.    2019

¶21.    Divinity saw Dr. Summers for an Employer Medical Examination on March 22, 2019. He found that Divinity would benefit from additional psychiatric evaluation and that she would "benefit from changing or altering some of her medication treatment" that did not appear to be helpful. He determined Divinity had reached maximum medical improvement from a "prior history of a chronic radiculopathy." Further, Dr. Summers determined that Divinity's pain in her lower left extremity and upper extremity was not related to her work injury.

¶22.    An independent medical evaluation was ordered and performed by Dr. Webb on July 15, 2019. Dr. Webb concluded that there was an "emotional component" of Divinity's injury and diagnosed her as suffering from an exacerbation of pre-existing "unspecified depressive disorder" due to her work injury. He indicated she may benefit from a different anti-depressant, medical treatment, and monthly psychotherapy for the next 9-12 months. He stated that she would reach maximum medical improvement in approximately 3 months.

¶23.    Divinity returned to Dr. Webb on October 17, 2019, and reported that she was doing "fair." She also indicated that she was still having back pain and down both legs. Dr. Webb noted that Divinity was not taking anti-depressants and recommended she begin taking her prescribed Lexapro on a daily basis. Divinity returned in November 2019 and reported that

she was feeling better due to the Lexapro and the pain medication provided by Dr. Williams. Dr. Webb noted that Divinity's behavior had improved and she did not seem to be focusing so much on her pain.

## VII. 2020

¶24. Divinity was seen by a new provider for pain management, Dr. Cook, on January 13, 2020.[1] He continued her on Neurontin and started her on Nucynta. A month later, Divinity returned reporting that her pain had improved since taking the Nucynta. Dr. Cook stated that he was going to eventually wean Divinity off of her prescribed Tramadol. He also put Divinity on Baclofen and Movantik. Divinity continued to follow up with Dr. Cook through November 2021, and the record is devoid of any indication whether she continues to see him.

¶25. Divinity had her last appointment with Dr. Webb on February 13, 2020. She reported increased pain but indicated she was making progress with her depression and mood. Dr. Webb recommended she continue treatment for her depression and mood, and placed her at maximum medical improvement.

## PROCEDURAL HISTORY

¶26. Divinity filed her petition to controvert with the Mississippi Workers' Compensation Commission on September 28, 2015, through her attorney Brad Baskin. Hinds County School District ("Employer") and Bridgefield Casualty Insurance Company ("Carrier") filed an answer on October 21, 2015, admitting compensability for the injury. However, the

---

[1] Dr. Williams had since moved to another state.

10

answer contested the extent and nature of Divinity's injury and denied it had been determined that she was temporarily or permanently disabled.

¶27. Divinity filed a "Motion to Compel Payment of Indemnity Benefits" on February 29, 2016, and a "Motion to Compel Medical Treatment" on March 10, 2016. A telephonic hearing on both motions took place on June 20, 2016. The administrative judge entered an order on June 24, 2016, determining that the Employer and Carrier would continue to pay for Divinity's medical treatment from Drs. Tullis, Vohra, and Koestler. In addition, the Employer and Carrier were ordered to pay temporary total disability benefits for Divinity beginning April 1, 2016, and continuing until Divinity reached maximum medical improvement or stopped seeing the associated doctors. The order also stated that whether Divinity was entitled to temporary total disability benefits or permanent disability benefits was to be "reserved for a hearing on the merits."

¶28. On October 26, 2016, the Employer and Carrier filed a "Motion to Suspend Payment of Temporary Total Disability and to Deny Medical Treatment." An administrative judge entered an order on March 28, 2017, after conducting a telephonic hearing. The order directed that the Employer and Carrier approve and pay for the claimant to undergo knee surgery by Dr. O'Mara and continue to pay temporary total disability benefits to Divinity. The order specified that this would be the case until Divinity "reache[d] maximum medical improvement from the aforementioned surgery or further [o]rder of th[e] administrative judge."

11

¶29.    On June 10, 2019, an administrative judge conducted a telephonic hearing and stated that an independent medical evaluation ("IME") would be helpful in this matter.  The judge appointed Dr. Webb of Ridgeland to perform the evaluation.  Dr. Webb was to advise the Commission of his opinion as to Divinity's "current medical state."  Dr. Webb performed his evaluation and assessment on July 15, 2019.  In summary, Dr. Webb found that Divinity was currently suffering from "an exacerbation of her pre-existing Unspecified Depressive Disorder due to her work injury."  This pre-existing disorder dated back "at least ten years."  He estimated that Divinity would reach maximum medical improvement from a psychiatric standpoint in approximately three months.  Divinity saw Dr. Webb for at least four follow-up appointments following the initial assessment.

¶30.    A merit hearing on the claim was held on November 6, 2020.  The parties stipulated to the following:

1.    Claimant sustained a compensable injury on April 3, 2014;
2.    Claimant's average weekly wage was $1,179.51;
3.    Claimant's compensation rate was $454.42;
4.    Claimant was placed at maximum medical improvement for her back by Dr. Jason Tullis on January 6, 2017;
5.    Claimant was placed at maximum medical improvement for her right lower extremity by Dr. James O'Mara on July 18, 2017. Dr. O'Mara assigned Claimant a 5% anatomical impairment rating to the right knee and further assigned no physical restrictions to the leg;
6.    Claimant was placed at maximum medical improvement for her psychological condition by Dr. Mark Webb on February 13, 2020. Dr. Webb assigned Claimant a 0% psychological impairment rating, and he further assigned no physical restrictions for Claimant's psychological injury.

At the hearing, Divinity was the only witness called to testify.  On cross-examination,

counsel for the Employer and Carrier emphasized that "no doctor ha[d] ever related [Divinity's] upper extremity complaints to [her] injury" sustained on April 3, 2014.

> Q: So I want you to tell me . . . . Show me a single record where a doctor has said your upper extremity complaints are related to your work injury?
>
> A: Based on conversations.
>
> Q: No, ma'am. I'm not talking about conversations. I want a record.
>
> A: I do not have that record with me because I didn't know that you needed it.
>
> . . . .
>
> Q: We've got all of your records here from every doctor and there is no record in any of these records that says your upper extremity problems are related to the work injury. So I'm asking you, do you have a record and if so, would you produce it to your attorney so we can add it into the record in this case?
>
> A: I will get my records from Dr. Wolfe, complete records, and give it to [my attorney] and get [him] to send it.
>
> Q: We've got the complete records from Dr. Wolfe.
>
> A: How do I answer the question[?] I'm only telling you what my doctor and I discussed.
>
> Q: Let me ask you this, Dr. Vohra told you it wasn't related . . . you read his report, didn't you?
>
> A: Yeah. But I don't agree with it.
>
> . . . .
>
> Q: [Dr. Vohra's report stated,] "It is my opinion with a reasonable degree of medical certainty that her upper extremity complaints are not part of her job injury or causally related to the treatment." Now, you read that report, did you not?
>
> A: That's his opinion.

At the conclusion of the hearing, the record was held open in order to obtain an additional deposition and "continue potential settlement discussions."

¶31. On June 23, 2021, the administrative judge entered an order stating that the record was closed and the parties had indicated an order was necessary.[2] The order summarized the events and filings in Divinity's case before addressing the judge's findings. The judge found that Divinity's complaints had "evolved" from her initial work injury report and a preponderance of the evidence did "not support a finding that [Divinity]'s right and left upper extremity complaints of pain and numbness which radiate in the hands bilaterally arose out of and in the course of her employment."

¶32. Ultimately, the administrative judge's order held that Divinity was entitled to (1) "temporary total disability benefits at the weekly rate of $454.42 . . . starting on February 12, 2015 and continuing until [her] date of maximum medical improvement on March 22, 2019," (2) "permanent partial disability benefits for 8.75 weeks beginning July 18, 2017, at the rate of $454.42 per week," (3) "all medical services and supplies required by the nature of [her] injury and the process of recovery[,]" and (4) "[a] 10% penalty on any untimely paid installments of compensation."[3] The Employer and Carrier filed a notice of suspension of payment the following day. Divinity's attorney filed a motion to withdraw as counsel on June 29, 2021; that request was granted on June 30.

---

[2] The record indicates that Divinity filed a Motion to Compel Medical Treatment on February 2, 2021, requesting that she be permitted to undergo a "Spinal Cord Stimulator (SCS)." The Employer and Carrier filed an answer on February 4, 2021. From there, the record skips ahead to the administrative judge's order entered on June 23, 2021.

[3] The order did not specify any particular amount that was due under a "penalty." It was merely a general order to pay a penalty if any payment was late. Divinity never filed a motion requesting a penalty for any late payments pursuant to that order.

14

¶33.    On September 21, 2021, the Employer and Carrier filed a Motion Contesting the Reasonableness of Future Medical Treatment, largely referencing the administrative judge's order from January 12, 2021.  In particular, that order relieved the Employer and Carrier of any responsibility to provide additional injections or physical therapy and directed that Divinity begin to be weaned off the opioids she had been taking for pain.  The motion alleged that Divinity was still being prescribed the medications she was to be taken off of and had been "recommended a spinal cord stimulator trial" by Dr. Cook.

¶34.    A hearing was held on the motion on October 21, 2021.  The administrative judge issued an order on December 9, 2021, stating that the Employer and Carrier were no longer required to pay for or reimburse Divinity for several prescriptions but would continue to be responsible for the payment of the prescribed opioid medications so long as Divinity took part in a medically-directed tapering program.[4]  The order also stated that a spinal cord stimulator trial in Divinity's case was not reasonable or necessary and, thus, would not be paid for by the Employer and Carrier. Divinity requested a review hearing from the Commission on December 15, 2021.  On January 10, 2022, the Commission entered an interlocutory order dismissing Divinity's petition without prejudice and remanding the cause to the administrative judge "for such further proceedings as may be necessary to dispose of

---

[4]  The order further stated that the Employer and Carrier were to be provided with monthly records indicating that Divinity was, in fact, being tapered off the medications.  If they did not receive this information, they would be "immediately relieved" from the obligation to pay for the prescription.

15

all remaining issues."

¶35.    Divinity filed a Motion to Compel Disability Benefits on May 11, 2022. The administrative judge reviewed the motion as one to reinstate a claim because Divinity had failed to timely appeal.  The administrative judge found that Divinity "simply repeat[ed] the arguments previously made at the merit hearing" and did not allege "a change in conditions or circumstances" or "a mistake in determination of fact in the merit order."  Consequently, the motion was dismissed on May 16, 2022.  Divinity then filed a request "seeking Full Commission review" of that dismissal on May 26, 2022.

¶36.    On November 15, 2022, Divinity moved to compel the Employer and Carrier to approve and pay for medical treatments caused by her work-related injury.  The full Commission entered its final order affirming the administrative judge's June 23, 2021 order in Divinity's claim on December 13, 2022.  Divinity appealed on December 22, 2022.

**ANALYSIS**

¶37.    Divinity's appeal argues that (1) the Commission reviewed the "wrong order[,]" (2) the Commission allowed compensation "for a leg injury [she] did not sustain[] via employment or at any time in [her] life," (3) the Commission erred in allowing a misrepresentation to be included in a Form B-18 Payment Report, making her eligible for penalty payments, and (4) the Commission erred in determining the applicable compensation she was entitled to.

¶38.    Divinity concludes her appellate brief by requesting the following relief: (1) reversal

16

of the decision to award 8.75 weeks at 5% occupational disability for an "unfounded leg injury[,]" (2) reversal of the decision denying Divinity permanent total disability, (3) an award of "234 weeks of compensation payments at a rate of $454.42 per week[,]" and (4) a 20% penalty for "unpaid installment[s] under the terms of an awarded compensable payment not paid within fourteen days of due date." As evidenced by her requests for relief, the crux of Divinity's appeal involves the validity of the administrative judge's order in June 2021, which was affirmed by the Commission. While she appeals from the Commission's December 13, 2022 order declining to reinstate her claim, that order rests upon the administrative judge's June 23, 2021 order.[5]

¶39. "The standard of review in worker's compensation cases is limited by the substantial evidence test. This Court will not reverse the decision of the Workers' Compensation Commission unless it finds that the decision is clearly erroneous and contrary to the overwhelming weight of the evidence." *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 489 (¶11) (Miss. Ct. App. 2004) (citing *Smith v. B.C. Rogers Processors Inc.*, 743 So. 2d 997, 1002 (¶13) (Miss. Ct. App. 1999)). "Substantial evidence consists of sufficient evidence for reasonable minds to accept as adequate to support the Commission's conclusion." *Bowdry v. City of Tupelo*, 337 So. 3d 1158, 1163 (¶12) (Miss. Ct. App. 2022)

---

[5] When reviewing a workers' compensation case, this Court does not review the decision of the administrative judge; rather, we review the decision of the Commission. *Bowdry v. City of Tupelo*, 337 So. 3d 1158, 1162 (¶12) (Miss. Ct. App. 2022) (quoting *Sheffield v. S.J. Louis Constr. Inc.*, 285 So. 3d 614, 618 (¶8) (Miss. 2019)).

(quoting *Sheffield v. S.J. Louis Constr. Inc.*, 285 So. 3d 614, 618 (¶8) (Miss. 2019)).

¶40.    "This highly deferential standard of review essentially means that this Court and the circuit courts will not overturn a Commission decision unless said decision was arbitrary and capricious."[6] *Clear River Const. Co. v. Chandler ex rel. Chandler*, 926 So. 2d 273, 275 (¶9) (Miss. Ct. App. 2006) (citing *Hale v. Ruleville Health Care Ctr.*, 687 So. 2d 1221, 1224 (Miss. 1997)).  It is not for this Court to determine the facts in this case.  Indeed, it is the duty of the Commission to act as the trier of fact; this Court's role is to "determine whether the factual determination made by the Commission is supported by substantial credible evidence."  *Id.* at (¶10) (citing *S. Cent. Bell Tele. Co. v. Aden*, 474 So. 2d 584, 589 (Miss. 1985)).

¶41.    "Where no evidence or only a scintilla of evidence supports a Worker's Compensation Commission decision, this Court does not hesitate to reverse."  *Guy v. B.C. Rogers Processors Inc.*, 16 So. 3d 29, 32 (¶7) (Miss. Ct. App. 2008) (quoting *Foamex Prods. Inc. v. Simons*, 822 So. 2d 1050, 1053 (¶11) (Miss. Ct. App. 2002)).  In Divinity's case, the administrative judge was able to review numerous pieces of evidence when making his decision including:

---

[6] "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Smith v. Pub. Emps. Ret. Sys. of Miss.*, 338 So. 3d 672, 678 (¶25) (Miss. Ct. App. 2022) (quoting *Richardson v. Pub. Emps. Ret. Sys. of Miss.*, 290 So. 3d 1265, 1271 (¶12) (Miss. Ct. App. 2019)). "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.*

(1)     Medical records of Drs. Williams and Cook;
(2)     Medical records of Dr. Tullis;
(3)     Medical records of Dr. Wolfe;
(4)     Medical records of Dr. O'Mara, Jr.;
(5)     Medical records of Dr. Webb;
(6)     Medical records of Dr. Datz;
(7)     Medical records of Dr. Koestler;
(8)     Medical records from The Therapy Center;
(9)     Functional capacity evaluation report by ErgoScience;
(10)    Employer medical evaluation report by Dr. Vohra;
(11)    Employer medical evaluation report by Dr. Summers;
(12)    Medical records of the MEA Medical Clinic;
(13)    Deposition transcript and exhibits of Dr. Webb's deposition;
(14)    Divinity's Notice of Intent for the 2015-2016 School Year and Approved Retirement Resignation;
(15)    Divinity's Notice of Physician Choice;
(16)    MEA visit note and pain diagram (dated April 4, 2014);
(17)    Mississippi Sports Medicine's history and physical forms (dated April 29, 2014, October 27, 2015, and February 19, 2016);
(18)    McColumn Physical Therapy's patient information and pain diagram;
(19)    Patient Evaluation of Comprehensive Pain Specialists;
(20)    Medical records of Drs. Wolfe and Tullis from the University of Mississippi Medical Center;
(21)    Functional Capacity Evaluation (dated October 20, 2015);
(22)    IME report of Dr. Vohra;
(23)    Note from Dr. Koestler (dated October 12, 2016);
(24)    Southern Behavioral Medicine Associates' pre-surgical psychological interview and progress notes;
(25)    IME report and progress notes of Dr. Webb (dated July 15, 2019);
(26)    IME report (dated March 22, 2019) and addendum report (dated July 5, 2020) of Dr. Summers; and
(27)    Deposition transcript of Dr. Summers.

¶42.   In addition, Divinity was present at the hearing and was called to testify. She was also cross-examined. With nearly thirty different pieces of evidence reviewed by the administrative judge, this Court is not persuaded that the Commission's decision was based on a mere scintilla of evidence. In the administrative judge's order, he pointed to multiple

19

instances in the record that supported his decision, such as:

> [Divinity] has undergone three EMG/Nerve Conduction Studies which were all inconsistent. Dr. Summers could not ascribe an organic reason for her upper extremity complaints based on the testing that was performed and felt that her complaints of pain were non[-]organic or due to a somatoform disorder[;[7]] . . . [t]here was no anatomic or neurological explanation that would be based on her anatomy to explain her complaints[;] . . . there were no positive testing results or anatomical findings to explain the origin or cause of [Divinity]'s left lower extremity pain complaints[; and] . . . the left lower extremity complaints began several years after her right lower extremity systems. . . . Dr. Summers felt that [Divinity's complaints of pain] would not be related to an injury some six years before. . . . [Divinity] complained of bilateral upper extremity numbness and pain[, but] there are no medical records stating that those complaints arose out of [her] work injury on April 3, 2014. . . . Although [Divinity] continued to complain of right lower extremity pain and numbness following surgery to her right knee, the record is devoid of any showing that the right knee injury resulted in any impact to [Divinity]'s ability to work and earn wages. . . . [Divinity] did not return to the Employer after being placed at maximum medical improvement by her treating doctors [and] only completed one job search attempt following her injury in 2014[;] . . . [t]he functional capacity exam performed by ErgoScience shows that [Divinity] is minimally capable of working at a sedentary level[; and] . . . the lack of medical proof combined with [Divinity]'s single job search do not support a finding that [she] has sustained a loss of wage earning capacity due to her back injury on April 3, 2014. . . . Dr. Webb placed [Divinity] at psychiatric maximum medical improvement on February 13, 2020. . . . [T]he psychological proof in the record does not support a finding that [Divinity] has sustained a loss of wage earning capacity due to her psychological injury following her work injury on April 3, 2014.

The medical records provide substantial evidence that Divinity's injury evolved throughout

---

[7] Somatoform disorder "is diagnosed when a person has a significant focus on physical symptoms, such as pain, weakness, or shortness of breath, to a level that results in major distress and/or problems functioning." Philip R. Muskin, *What is Somatic Symptom Disorder?* American Psychiatric Association 2021, https://www.psychiatry.org/patients-families/somatic-symptom-disorder/what-is-somatic-symptom-disorder (last visited Jan. 23, 2024).

the years of treatment and was not caused by that initial injury while at work. We find substantial evidence supports the administrative judge's order and the full commission's order.

¶43. Addressing another one of Divinity's cited arguments, her assertion that the Commission erred by affirming the "wrong order" of the administrative judge is misplaced. This contention is based upon her request for a review of the May 16, 2022 order; the Commission instead affirmed the June 23, 2021 order. A review of the record clearly demonstrates that the Commission made this decision based on Divinity's request for review. Divinity's argument cited findings that were made in the June 23, 2021 order. The Commission reviewed and affirmed that order.

¶44. Finally, we address Divinity's request for penalty payments. Her brief contends that the Form B-18 "Notice of Suspension of Payments" filed by the Employer and Carrier contained a false statement (that "Employee returned to work at weekly wages of $1179.51"), meaning she is entitled to penalty payments under Mississippi Code Annotated section 71-3-69 (Rev. 2021).[8] But she did not raise this specific issue before the Commission. She never

---

[8] Mississippi Code Annotated section 71-3-69 reads:

Any person who willfully makes any false or misleading statement or representation for the purpose of obtaining or wrongfully withholding any benefit or payment under this chapter is guilty of a felony and on conviction thereof may be punished by a fine of not to exceed Five Thousand Dollars ($5,000.00) or double the value of the fraud, whichever is greater, or by imprisonment not to exceed three (3) years, or by both fine and imprisonment.

filed a motion or argued that a particular payment was late or asked the Commission to award a penalty for any late payments. Divinity first mentions the issue regarding penalties in her appeal before this Court. An argument not raised before the lower court is not eligible for this Court to consider on appeal. *LaFoe v. Miss. Emp. Sec. Comm'n*, 909 So. 2d 115, 119 (¶16) (Miss. Ct. App. 2005) ("Issues not raised in the lower court cannot be raised for the first time on appeal.") (citing *Davis v. State*, 684 So. 2d 643, 658 (Miss. 1996)). Additionally, after making this assertion, she only mentions the issue once more in her brief. Both mentions of the Form B-18 are assertions with no facts or law supporting the relief requested. "[A]ppellate courts in Mississippi will not review any issues on appeal if the party fails to cite relevant authority in support of his or her arguments." *Lambert v. Lambert*, 872 So. 2d 679, 683 (¶14) (Miss. Ct. App. 2003).

¶45. Procedural bar notwithstanding, the administrative judge's June 23, 2021 order mentioned penalty payments. Specifically, the administrative judge stated in that order that Divinity would be entitled to "[a] 10% penalty on any untimely paid installments of compensation pursuant to Miss. Code Ann. Section 71-3-37(5) (Rev. 20[21])."[9] As stated

---

[9] Mississippi Code Annotated section 71-3-37(5) provides:

If any installment of compensation payable without an award is not paid within fourteen (14) days after it becomes due, as provided in subsection (2) of this section, there shall be added to such unpaid installment an amount equal to ten percent (10%) thereof, which shall be paid at the same time as, but in addition to, such installment unless notice is filed under subsection (4) of this section, or unless such nonpayment is excused by the commission after a showing by the employer that owing to conditions over which he had no

previously, Divinity never filed any motion before the Commission requesting penalties for any payments that were not timely made. Nothing in the record addresses what payments, if any, were untimely made. Divinity states that the payments stopped "after April 9, 2020," meaning that all payments after that date should be considered late. As stated above, however, we find substantial evidence to support the June 23, 2021 order, and there is no evidence that any payments made under that order were late. The Employer and Carrier made their necessary payments. Therefore, Divinity is not entitled to penalty payments.

**CONCLUSION**

¶46.    We find substantial evidence supports the findings of the administrative judge and the full Commission and no reversible error, and we therefore affirm the Commission's order.

¶47.    **AFFIRMED.**

      **BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**

---

control such installment could not be paid within the period prescribed for the payment.